UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| ARTHUR L. CAHOON, *et al.*, <br> Plaintiffs, <br><br> vs. <br><br> BAYERISCHE HYPO-UND <br> VEREINSBANK AG, *et al.*, <br> Defendants. | § <br> § <br> § <br> § Civil Action No. 7:11-mc-00042 <br> § <br> § <br> § |

## DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO QUASH SUBPOENA AND REQUEST FOR PROTECTIVE ORDER

Defendants Bayerische Hypo- und Vereinsbank AG; Bayerische Hypo- und Vereinsbank AG – New York Branch; UniCredit U.S. Finance, Inc.; and HVB Risk Management Products, Inc. (collectively, "HVB") hereby file this Response in Opposition to Edmundo Ramirez's Motion to Quash Subpoena pursuant to Federal Rule of Civil Procedure 45 and Request for Protective Order ("Motion") and in support thereof would show as follows:

### STATEMENT OF FACTS

Between June and August 2000, Arthur Cahoon engaged in a tax shelter transaction known by the acronym BLIPS, using it to avoid paying taxes on some $50 million in income he earned that year. The IRS determined that the transaction was fraudulent, and Mr. Cahoon eventually paid the taxes he owed on that income. The tax shelter was sold to Mr. Cahoon by KPMG and a firm called Presidio Advisors, which also acquired for him a legal opinion from the law firm Sidley Austin Brown & Wood LLP. In 2000, HVB provided a loan to Mr. Cahoon called for by the BLIPS transaction structure, which was intended to make the transaction look

like a leveraged investment. The loan was paid back and the transaction completed by August that year.

In 2004, movant attorney Edmundo Ramirez, Esq. filed suit on Mr. Cahoon's behalf in the state of Florida against KPMG, Sidley Austin Brown & Wood, and Presidio, alleging fraud and conspiracy to defraud, among other claims, in connection with the BLIPS transaction. The case settled in 2005.

On March 18, 2011, Mr. Ramirez filed suit on behalf of Mr. Cahoon against HVB in the U.S. District Court for the Southern District of New York. HVB has moved to dismiss the action on statute of limitation grounds based on the passage of 11 years since its loan to Mr. Cahoon was funded. In opposition, Mr. Cahoon filed a declaration ("Cahoon Decl.") in which he seeks to save his claim by arguing that he did not "discover" the fraud committed by HVB until December 2010, relying on a New York provision which allows that claims for fraud may be brought within two years of the date of "discovery" notwithstanding the lapse of more than six years from the date of accrual, the usual limitations term. Thus, a significant factual issue in the case is when Mr. Cahoon "discovered" his claims against HVB. (*See* Declaration of Mark W. Lerner, Dated November 28, 2011 ("Lerner Decl.") at Ex. 1 ("Cahoon Decl.")).

Mr. Cahoon's declaration[1] states that he did not know of his claims before December 2010 because (a) *Mr. Ramirez* did not know of the claims earlier, (b) *Mr. Ramirez* exercised due diligence in seeking to learn about the claims earlier, and (c) Mr. Cahoon *relied upon Mr. Ramirez*. The Declaration states (with emphases added):

- *We . . . relied on our legal counsel*, in the exercise of their reasonable due diligence on our behalf, to investigate any information we gave them or that they gathered on their own regarding possible claims in connection with BLIPS. (Cahoon Decl. at ¶ 21).

---

[1] Although the Cahoon Decl. purports to have been filed with exhibits, no exhibits were actually filed along with it.

- I did not have any information that put me on notice of the possibility that HVB committed fraud by charging fees for a loan that did not exist until sometime after December 2010, when my legal counsel in the KPMG Complaint, *Mr. Ramirez, was informed* by Brian G. Isaacson of Isaacson & Wilson of the testimony of Amir Makov, one of the principals of Presidio, in the criminal case of U.S. v. Stein and of the Non-Prosecution Agreement entered into by Deutsche Bank on December 10, 2010. Sometime in January or February 2011, *Mr. Ramirez informed me* of what Mr. Isaacson had told him about Makov's testimony and of the Deutsche Bank NPA. (Cahoon Decl. at ¶ 26).

- *It was not until I was contacted by Mr. Ramirez,* following his communication with Mr. Isaacson, *that I was informed of the evidence* that came out in the Stein case and from the Deutsche Bank NPA that I learned for the first time that before making any BLIPS loans, HVB had entered into an agreement with Presidio whereby HVB would and did swap the fixed interest rate of the premium loan for a variable interest rate after I had entered into my loan. (Cahoon Decl. at ¶ 27).

- Furthermore, had I known these facts prior to December 2010, I would have sued HVB for fraud sooner than I did. We were not able to discover HVB's fraud, *despite the exercise of reasonable due diligence by me and my legal counsel*. We did not have a clue that HVB and Presidio had a prior agreement between themselves to enter into the swap agreement or of the adverse effect that had on the premium loan or of the dire tax consequences of the swap to me. (Cahoon Decl. at ¶¶ 31-32).

- We did not name HVB as a defendant in the KPMG Complaint because . . . *we had no clues to look for* and did not discover any evidence that HVB had committed fraud by entering into an agreement with Presidio, ahead of the loan to me, to do an interest rate swap after the loan . . . . (Cahoon Decl. at ¶ 23).

Thus, in his Declaration, Mr. Cahoon contends that his own notice of his claims against HVB occurred when Mr. Ramirez received notice of Mr. Cahoon's claims against HVB. The Cahoon Decl. discusses when Mr. Ramirez learned those facts (*i.e.,* after December 2010), how he learned those facts (*i.e.,* from Brian Isaacson), and what he told Mr. Cahoon (*i.e.,* "Mr. Ramirez informed me . . ."; "I also learned from my legal counsel . . ." Cahoon Decl. at ¶¶ 26, 30).

However, if the lawsuit survives HVB's motion to dismiss and reaches either summary judgment or the trial stage, HVB will seek to establish that, contrary to Mr. Cahoon's claims in his Declaration, Mr. Ramirez, and hence Mr. Cahoon, was on notice of Mr. Cahoon's claims

3

against HVB long before December 2010; indeed, as early as 2003. However, HVB cannot cross examine a "declaration," especially one based on hearsay where the declarant wrote about what another person knew and when; and, as described in more detail below, at deposition Mr. Cahoon could not speak to what Mr. Ramirez knew or did not know, or when.

The areas of inquiry for Mr. Ramirez on the subject of notice of Mr. Cahoon's claims against HVB are several. First, the 2004 complaint Mr. Ramirez filed against KPMG, Presidio, and the law firm quoted frequently, with footnoted citations and exhibit attributions, to a United States Congressional Report which (after public hearings) critically examined and explained the roles of KPMG, Sidley Austin Brown & Wood, and the banks Deutsche Bank and HVB in BLIPS, including the "swap" which Mr. Cahoon argues he was ignorant of and which he argues he only learned of in 2010. HVB intends to examine Mr. Ramirez about the Senate report and why Mr. Ramirez was allegedly not on notice of the claims against HVB in light of the report.

Second, there were highly publicized criminal prosecutions based on BLIPS, including the prosecution of the head of the BLIPS business for HVB, Domenick DeGiorgio, who pled guilty to tax fraud in 2005. HVB will inquire as to Mr. Ramirez's knowledge of these criminal prosecutions.

Third, in February 2006, HVB itself entered into a Deferred Prosecution Agreement ("DPA") with the Southern District of New York's U.S. Attorney's Office. Both the Department of Justice and HVB issued press releases regarding the DPA and it was also widely reported in the media. HVB's "Statement of Admitted Facts" in the DPA stated that HVB engaged in fraud in connection with BLIPS, that HVB made "loans that were not bona fide loans," that the loans had no legitimate business purpose, and that there were swaps which resulted in no loan premium. For example, HVB's publicly released February 2006 DPA stated:

4

> 13. The transactions were designed to create the false impression that the client/"borrowers" had entered seven year loans with an unusual "premium" structure at an interest rate well above prevailing market rates. In fact, the "loans" were entered using an estimated interest rate figure that was necessarily inaccurate, since the actual nominal rate was not known until approximately one week after the initial "loans" were entered. At that time, the clients and HVB entered interest rates swaps with a retroactive effective date to the date of the initial book entries, setting the "nominal" rate on the principal portion of the loan that generated the purported "premium." The net effect of the swaps, however, was that the clients would pay only a market rate of interest on the full amount of the loaned funds (principal and purported "premium"). In other words, although the "loans" were represented in the transaction documents and opinion letters to be above-market, fixed rate loans with a premium, *they were intended from inception to be variable-rate loans with no premium.* This entire series of transactions was necessary for the purported loans to generate the illegal tax benefits sought by the clients, and had no other legitimate business purpose. (Emphasis added.)

HVB will inquire as to Mr. Ramirez's knowledge of the DPA.

Fourth, HVB was sued repeatedly throughout this time period, including in two federal class actions. On January 28, 2005, a class action was filed by Thomas Becnel against HVB and Presidio, among others, arising from the same transaction as pled in the instant Complaint. *Becnel v. KPMG LLP, et al.,* Case No. 05-CV-06015-RTD (W.D. Ark). Class certification was denied on August 9, 2005. (Complaint ¶ 42). Then, on September 2, 2005, a new class action involving the same transaction was filed against HVB and others in *Kottler v. Deutsche Bank AG et al.,* Case No. 05 CV-7773 (PAC) (S.D.N.Y.). Class certification in *Kottler* was denied on March 29, 2010. (Complaint ¶ 43). Mr. Cahoon was a member of the purported classes in both cases. HVB will inquire as to Mr. Ramirez's knowledge of these lawsuits.

Fifth, although Mr. Ramirez settled Mr. Cahoon's civil case in 2005, he represented him when Mr. Cahoon became a government cooperating witness in the Southern District of New York's criminal case in 2006. Mr. Ramirez and Mr. Cahoon travelled to New York on June 6, 2006, for Mr. Cahoon's interview with federal prosecutors. (Lerner Decl., at Ex. 2 ("Cahoon Tr."), at 209-13). In November 2008, Mr. Cahoon testified at the trial about his BLIPS tax

shelter. HVB will inquire as to what Mr. Ramirez knew and learned prior to and in connection with his visit to the Manhattan U.S. Attorney's Office to represent Mr. Cahoon in his BLIPS proffer sessions.

As stated above, Mr. Cahoon has asserted in his Declaration that Mr. Ramirez did not know of his claims against HVB until December 2010.

On November 3, 2011, defendants deposed Mr. Cahoon and asked him questions regarding the discovery of his claims. Mr. Cahoon maintained his reliance on Mr. Ramirez's knowledge and purported "due diligence" in connection with this matter, and Mr. Cahoon was unable to answer questions about Mr. Ramirez's knowledge or due diligence because he didn't know the answers. For example, with respect to the 2003 Senate Report, he deferred to Mr. Ramirez's knowledge and could not shed his own light on it:

> Q. Without telling us about your conversations with Mr. Ramirez, what did you know in 2004 about the U.S. Senate's investigation?
> A. I wasn't really following the U.S. Senate's investigation. I got my information from Edmundo [Ramirez] and he had been involved in prior Complaints with KPMG
>
> * * *
>
> Q. Did you know that Mr. Ramirez had evidence about HVB's role in the transaction as well?
> A. I didn't know what evidence Mr. Ramirez had other than the fact that KPMG had misled me.

Cahoon Tr. 178; 187. With respect to the DeGiorgio guilty plea in 2005 and the HVB Deferred Prosecution Agreement of February 2006, Mr. Cahoon again deferred to Mr. Ramirez:

> Q. And did you know that Mr. DeGiorgio pled guilty to criminal tax violations in connection with his BLIPS-related work at HVB while your lawsuit was still going on?
> A. Did I know it then?
> Q. Yeah.
> A. No. I only know what Mr. Ramirez told me yesterday.
> Q. Okay. Did Mr. Ramirez tell you when he learned that HVB entered into a deferred prosecution agreement?
> A. He did not tell me when he learned that.

Cahoon Tr. 193. With respect to Mr. Cahoon's awareness of the federal class actions filed against HVB in 2005 based on BLIPS, he again deferred to Mr. Ramirez:

> Q. Did you ever hear the name Becnel or Becnel, B-e-c-n-e-l?
> A. Uh-uh.
> Q. Did you ever hear the name Kottler, K-o-t-t-l-e-r?
> A. No.
> Q. Did you ever discuss joining -- whether or not it would make sense for you to join a class in a class action as opposed to hiring your own -- bringing your own lawsuit?
> A. At that point we had already hired Mr. Ramirez and I was relying on his recommendations for how to proceed.

Cahoon Tr. 197-98. And with respect to the Cahoon Declaration itself, Mr. Cahoon testified that he did not write it, and that he relied entirely on Mr. Ramirez for its accuracy:

> Q. . . . [D]o you know who wrote . . . pages 1 through 9 of the Arthur Cahoon declaration[?]
> A. No. My assumption was it was Mr. Ramirez or someone in his office under his direction.
> Q. So you're not even sure who actually was the drafter of this language?
> A. No. Mr. Ramirez was responsible for that.
> Q. And do you know how Mr. Ramirez -- how did Mr. Ramirez learn the facts that are reflected in this declaration?
> A. He's been involved in this case for nearly a decade.

Cahoon Tr. 227. Finally, Mr. Cahoon was asked whether there are sources of information other than Mr. Cahoon himself from whom defendants could learn the facts relating to Mr. Cahoon's discovery of claims. That testimony was:

> Q. What did [Mr. Ramirez] do to research your claims against Hypo Vereinsbank in connection with your BLIPS transaction?
> A. I don't know.
> Q. Did you ever ask him what he did to research your claims against Hypo Vereinsbank?
> A. I did not.
> Q. If we wanted to know what Mr. Ramirez did to research your claims against Hypo Vereinsbank, how would we learn that?
> A. It would be a good idea to ask him.
> Q. And if we wanted to learn when Mr. Ramirez learned about claims against Hypo Vereinsbank, how would we learn that?
> A. Ask him.
> Q. And if we wanted to know when Mr. Ramirez knew about the Deferred Prosecution Agreement with HVB and the Government, how would we learn that?
> A. Probably ask him.
> Q. Do you know anybody else who would know that information besides Mr. Ramirez?
> A. You're asking me about something personal to him so I would suggest asking him.

> Q. Why didn't you name HVB as a defendant in the 2004 KPMG Complaint?
> A. Mr. Ramirez prepared the case; I didn't.

Cahoon Tr., 234-35.

Following the deposition of Mr. Cahoon, based on Mr. Cahoon's statements in both his declaration and his deposition, counsel for HVB notified Mr. Ramirez that it would need to ask him questions regarding these topics in a deposition. Correspondence on the subject is attached hereto as Lerner Decl. Exs. 3 through 8. HVB served a deposition subpoena (the "Subpoena") on Mr. Cahoon and this motion followed.

## ARGUMENT

Mr. Ramirez identifies two grounds on which he believes the Court should grant the Motion: that his deposition would require the "disclosure of privileged and other protected matter" and because it is "unduly burdensome and harassing." Motion at 3.

Rule 26(b)(1), Fed. R. Civ. P., provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense" and further specifies that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Nat'l Western Life Ins. Co. v. Western Nat'l Life Ins. Co.*, 2010 U.S. Dist. LEXIS 132024, 3-4 (W.D. Tex. Dec. 13, 2010). Additionally, the discovery rules "are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials." *Id.*

Mr. Ramirez has not asserted that the matter sought is not highly relevant and significant to HVB's defense of the case; nor could he. In the matter pending in the Southern District of New York, HVB has asserted that the claims brought by Mr. Cahoon are barred by the statutes of limitation. As a result, the facts bearing on when Mr. Cahoon had knowledge of his claims, or

had enough knowledge to have known about his claims, are important to HVB's defense.[2] As described *supra*, Mr. Cahoon himself has put Mr. Ramirez's personal knowledge of these facts at issue by claiming in both his Declaration and in sworn testimony that he relied on Mr. Ramirez to uncover potential claims against HVB. Therefore, both what Mr. Ramirez specifically knew and what actions he took to learn about potential claims against HVB during the period when Mr. Cahoon asserts that he did not know and could not have known about such claims is crucial to HVB's defense.

Although Mr. Ramirez claims that the Subpoena calls for the disclosure of privileged information, he provides no support for his assertion. "The burden of demonstrating the applicability of the [attorney-client] privilege rests on the party who invokes it." *Hodges, Grant & Kaufmann v. United States Government, Dep't of Treasury, IRS*, 768 F.2d 719, 720-721 (5th Cir. 1985); *see also Enron Corp. Sav. Plan v. Hewitt Assocs., L.L.C.*, 258 F.R.D. 149, 160 (S.D. Tex. 2009). However, apart from his conclusory declaration that the deposition would require the disclosure of protected attorney-client communications, Mr. Ramirez offers no evidence whatsoever to the Court why such information would be privileged. As a result, Mr. Ramirez has not met his burden and he cannot prevail on the motion under Fed. R. Civ. P. 45(c)(3)(A)(iii).

The information sought by HVB is not privileged attorney-client communications. The attorney-client privilege "exists to encourage clients to be candid with their attorneys" and therefore protects "only confidential communications of the client to the attorney." *Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Electric Co.*, 953 F.2d 1004, 1007 (5th

---

[2] The statute of limitations in New York provides for a two year "discovery rule." Under the discovery rule, the statute of limitations for fraud-based claims commences when a person of ordinary intelligence would be on inquiry notice of the alleged fraud. *See Weisl v. Polaris Holding Co.*, 226 A.D.2d 286, 287 (1st Dep't 1996).

Cir. 1992). The privilege also protects communications from the lawyer to his client, to the extent that "they would tend to disclose the client's confidential communications." *Hodges, Grant*, 768 F.2d at 720-721. Additionally, "what is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982).

The information sought here is information pertaining to when Mr. Ramirez learned about the facts that would have alerted him to claims against HVB, what he did to learn about such facts, and when he ultimately communicated his knowledge of these facts to his client Arthur Cahoon. Mr. Cahoon claims to have "relied on [Cahoon's] legal counsel as part of our exercise of reasonable due diligence to investigate. . . [any information] they gathered on their own regarding possible claims in connection with BLIPS." Cahoon Decl. ¶ 21. Furthermore, Mr. Cahoon claims that "[w]e did not know and could not, in the exercise of reasonable due diligence, have discovered HVB's fraud until. . . December 10, 2010." Cahoon Decl. ¶¶ 23, 26. Mr. Ramirez has not established that the testimony sought, concerning what Mr. Ramirez knew and when he knew it, or even what he told Mr. Cahoon about the facts, is privileged.

Quite to the contrary, Mr. Cahoon has stated in his Declaration his version of what Mr. Ramirez knew, when he knew it, and what and when he communicated it to Mr. Cahoon. Therefore, even if the information were privileged, Mr. Cahoon waived any privilege associated with this information. "[D]isclosure of any significant portion of a confidential communication waives the privilege as to the whole." *El Paso Co.*, 682 F.2d at 538. In fact, by "selectively disclosing confidential communications" a client has indicated that the communications are no longer confidential, and thus "fall[] outside of the reaches of the privilege." *Nguyen*, 197 F.3d at 207 (5th Cir. 1999).

Mr. Cahoon has placed at issue the activities of Mr. Ramirez in connection with discovering his potential claims against HVB. "We were not able to discover HVB's fraud, despite the exercise of reasonable due diligence by me and my legal counsel." Cahoon Decl. ¶ 32. Indeed, when asked by counsel for HVB what Mr. Ramirez did to discover the HVB DPA, Mr. Cahoon stated, "It would be a good idea to ask him." Cahoon Tr. at 234. In accord with the principle governing the selective disclosure of confidential communications "is a client's inability to, at once, employ the privilege as both a sword and a shield." *Nguyen*, 197 F.3d at 207, n. 18.[3] Mr. Cahoon cannot claim in both his Declaration and in sworn testimony that he relied on Mr. Ramirez to do appropriate "due diligence" in an effort to discover potential claims against HVB and then assert attorney-client privilege when HVB requests a deposition with Mr. Ramirez to learn exactly what it is he did.

Nor is this subpoena unduly burdensome.[4] "Whether a subpoena imposes an undue burden is a question of reasonableness determined by balancing the benefits and burdens of the deposition and whether the information is obtainable from an alternative source." *Positive Black Talk v. Cash Money Records*, 394 F.3d 357, 377 (5th Cir. 2004). Furthermore, the party seeking

---

[3] Accordingly, Cahoon's statement in the Cahoon Decl. that he provides such information "[w]ithout intending to waive [his] attorney/client privilege" is without effect. Cahoon Decl. ¶ 21.

[4] Mr. Ramirez argues that depositions of counsel of record are "disfavored." Motion at 3. However, while HVB's opposition herein meets even the strictest standards for deposing counsel, including the necessity of obtaining the information and the fact that the information was not attainable from any other source, as set forth in our argument herein, the cases Mr. Ramirez cites do not assist him. His citation to *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991) provides only that depositions of opposing counsel are disfavored; moreover, it was superseded in the Second Circuit by a ruling that the Federal Rules "require a flexible approach to lawyer depositions whereby the [court] takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship." *In re Friedman*, 350 F.3d 65, 72 (2d Cir. 2003). In another case relied upon by plaintiffs in their motion, that court reaffirmed the principle that "depositions of opposing counsel are not categorically prohibited. . . the request to depose a party's attorney must be weighed by balancing, generally speaking, the necessity for such discovery in the circumstances of the case against its potential to oppress the adverse party and to burden the adversary process itself." *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 424 (E.D.N.Y. 2007) (citations omitted).

to quash the deposition bears the burden of proving that the subpoena is unduly oppressive. *Wiwa v. Royal Dutch Petroleum*, 392 F.3d 812, 818 (5th Cir. 2004). Whether a burdensome subpoena is reasonable "must be determined according to the facts of the case." *Nat'l Western Life Ins. Co. v. Western Nat'l Life Ins. Co.*, 2010 U.S. Dist. LEXIS 132024 (W.D. Tex. Dec. 13, 2010).

The only evidence that Mr. Ramirez has put forth in support of his claim that the Subpoena is unduly burdensome is that he has "previously scheduled court engagements" on the date listed in the Subpoena. Motion at 4. However, Mr. Ramirez has made no effort to work with HVB to schedule his deposition at a time more convenient for him and has not provided a proposed deposition schedule that would accommodate his schedule. To the contrary, he recently offered by letter to have one Steven J. Umberger's deposition, another deposition in the case, take place in January 2011. We are confident that the district court in New York would be receptive to reasonable requests for scheduling accommodations, given that this case – in which the complaint was served on May 3, 2011 – has proceeded expeditiously.

HVB alerted Mr. Ramirez of the necessity to take his deposition by letter on November 11, 2011[5] in which HVB wrote, "[a]s you are an attorney in the case, [HVB] would be happy to discuss with you the scope of the deposition." (Lerner Decl., Ex. 3 (Nov. 11, 2011 letter)). Responding by letter of November 16, 2011, Mr. Ramirez did not communicate to HVB that the scheduled date presented a problem for him. Instead, Mr. Ramirez only made clear his intention to move to quash the Subpoena. (Lerner Decl., Ex. 4 (Nov. 16, 2011 letter)). HVB responded by letter on November 18, 2011 in which it both explained why it felt that Mr. Ramirez was a relevant fact witness and offered to work with Mr. Ramirez to make the deposition more

---

[5] HVB first contacted Mr. Ramirez's associate on November 10, 2011 to alert him to the necessity of his deposition. (Lerner Decl., Ex. 3 (Nov. 11, 2011 letter)).

convenient for him. (Lerner Decl., Ex. 5 (Nov. 18, 2011 Letter)). Mr. Ramirez responded by letter on November 21, 2011 repeating his refusal to consent and again failing to make any mention of any scheduling conflict. (Lerner Decl., Ex. 6 (Nov. 21, 2011 letter)). On November 22, 2011, counsel for HVB Mark Lerner sent Mr. Ramirez an e-mail informing him that HVB was going to ask the Court for a limited extension of discovery in order to be able to take the deposition of Mr. Ramirez and another fact witness sometime after December 2, 2011. (Lerner Decl., Ex. 7 (Nov. 22, 2011 e-mail)). Mr. Ramirez responded by letter of November 22, 2011 in which he only stated that he was taking action to quash the subpoena. (Lerner Decl., Ex. 8 (Nov. 22, 2011 letter)). Not until the motion itself did Mr. Ramirez ever state that he would move to quash the subpoena because his deposition conflicted with his schedule. HVB is happy to work with Mr. Ramirez to schedule the deposition at a mutually convenient time and place for all involved.[6]

For all of the foregoing reasons, HVB respectfully requests that this Court deny Mr. Ramirez's Motion to Quash and Request for Protective Order or, in the alternative, modify the Subpoena to allow Mr. Ramirez a reasonable time to comply.

Respectfully submitted,

s/Constantine Z. Pamphilis
Constantine Z. Pamphilis
Attorney-in-Charge
Southern District I.D. No. 19378
State Bar No. 00794419
KASOWITZ, BENSON, TORRES &
  FRIEDMAN LLP

---

[6] Even if this Court finds the current deposition schedule presents a burden to Mr. Ramirez, this Court should exercise its discretion and merely modify the Subpoena to make it more reasonable to him rather than to quash the Subpoena altogether. Fed. R. Civ. P. 45(c)(3)(A).

700 Louisiana Street, Suite 2200
Houston, Texas 77002
(713) 220-8800
Fax: (713) 222-0843

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record pursuant to the Federal Rules of Civil Procedure, on this the 28th day of November 2011.

                                      s/Constantine Z. Pamphilis
                                      Constantine Z. Pamphilis